July 15, 2026

**Supreme Court**

No. 2025-83-C.A.
(P2/23-2689AG)

State                           :

v.                              :

Noel Ignacio Moronta.           :

NOTICE: This opinion is subject to formal revision before publication in the Rhode Island Reporter. Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Telephone (401) 222-3258 or Email opinionanalyst@courts.ri.gov, of any typographical or other formal errors in order that corrections may be made before the opinion is published.

State                   :

v.                 :

Noel Ignacio Moronta.      :

Present:  Suttell, C.J., Robinson, Lynch Prata, Long, and Indeglia (ret.), JJ.

**O P I N I O N**

**Justice Long, for the Court.**   The defendant, Noel Ignacio Moronta (defendant or Mr. Moronta), appeals from a judgment of conviction and commitment following a bench trial at which he was found guilty of failing to report a death with the intention of concealing a crime, to wit, possession with intent to deliver a controlled substance, and a number of other crimes relating to possession and intent to deliver fentanyl, xylazine, and cocaine.  Before this Court, Mr. Moronta argues that police officers entered an apartment without a warrant in the absence of exigent circumstances and that the trial justice erred in denying his motion to suppress the fruits of the warrantless search.  For the reasons set forth in this opinion, we conclude that the trial justice erred in denying Mr. Moronta's motion to suppress.  We

- 1 -

therefore vacate his conviction and remand the case to the Superior Court for a new trial.

## Facts and Procedural History

We glean the following summary of relevant facts from the record of proceedings in the Superior Court. *See State v. Hudgen*, 272 A.3d 1069, 1075 (R.I. 2022). In January 2023, Rhode Island State Police Detective Juan Coronado, a member of the High Intensity Drug Trafficking Area (HIDTA) Task Force, learned from a confidential informant that two individuals known as "Noel" and "Ari" were selling and distributing drugs. Through his investigation, Det. Coronado discovered that these individuals were Mr. Moronta and Nelson Reyes (Mr. Reyes). Detective Coronado established surveillance operations at 113 Sisson Street in Providence (113 Sisson) and 716 Central Avenue in Johnston (716 Central)—addresses linked to Mr. Moronta and Mr. Reyes respectively. Detective Coronado also observed Mr. Moronta going to a third address, 20 Metcalf Avenue in North Providence (20 Metcalf). Detective Coronado subsequently learned that Noelia Moronta Palata (Ms. Moronta Palata), Mr. Moronta's sister, lived at 20 Metcalf. He also discovered that there were utility accounts associated with this address for the first and second floors of the building but not the third floor.

After maintaining intermittent physical surveillance of 20 Metcalf throughout February 2023 and observing Mr. Moronta coming and going on several occasions,

Det. Coronado installed a pole camera that allowed him to more closely surveil the outside of 20 Metcalf remotely via a live feed. Detective Coronado observed Mr. Moronta visiting 20 Metcalf an average of three times a week; he saw Mr. Reyes visit as well. As part of this investigation, Det. Coronado also directed his confidential informant to make two controlled drug buys from Mr. Moronta in February and early April 2023.

Although not known to detectives at the time, on April 3, 2023, Mr. Moronta attended a birthday party in Massachusetts with his then-girlfriend, Marien Solano (Ms. Solano); Ms. Solano had asked Mr. Moronta to invite his sister, but Ms. Moronta Palata did not answer her phone when he tried to reach her. The next day, Mr. Moronta called Ms. Solano expressing concern that something had happened to his sister and later asked her to leave work and meet him at 20 Metcalf. She drove to 20 Metcalf and found that Mr. Moronta had already arrived, so she proceeded to the second floor. Upon entering the second-floor apartment, she observed that Mr. Moronta was upset and saw Ms. Moronta Palata lying unresponsive on the bathroom floor. Ms. Solano did not have a phone with her, but Mr. Moronta told her that he would call 911. Ms. Solano left the apartment shortly after this conversation, and no one called for emergency services.

That same day, Det. Coronado received information from his confidential informant that "a deceased person was possibly inside" 20 Metcalf. In reviewing

the surveillance footage from the pole camera, Det. Coronado observed Mr. Moronta, Mr. Reyes, and Ms. Solano coming and going from the building that day. Detective Coronado relayed this information to the HIDTA team, who dispatched Detective Justin Andreozzi, another HIDTA task force member, and put 113 Sisson under surveillance. Detective Andreozzi observed Mr. Moronta and Mr. Reyes leaving 113 Sisson and followed them to the corner of Fruit Hill Avenue and Metcalf Avenue (several blocks from 20 Metcalf), where they were stopped by several police officers. Detective Andreozzi approached the men, who were standing outside the vehicle, and performed a pat down of Mr. Moronta. Detective Andreozzi felt a hard object in Mr. Moronta's pocket, removed that object, and discovered that it was a set of keys. Detective Andreozzi asked Mr. Moronta where he was going, and Mr. Moronta gestured towards Metcalf Avenue in the direction of 20 Metcalf. Detective Andreozzi then took the keys and proceeded to 20 Metcalf.

While the traffic stop was still ongoing, Det. Coronado, in concert with his HIDTA supervisor, made the decision to enter 20 Metcalf based on what he observed from the pole camera and the tip from the informant. The officers knocked and announced their presence before forcibly entering first the building and then the second-floor apartment. Officers conducted a sweep of the entire apartment and found an unresponsive person on the floor of the bathroom, who was later identified as Ms. Moronta Palata. Officers then proceeded to the third floor and forcibly

entered the third-floor apartment to do a sweep. They did not find any people, but they did see drug paraphernalia and contraband in plain view.

When Det. Andreozzi arrived at 20 Metcalf with the keys, he discovered that officers had already forcibly entered the second and third floors. He tried the keys in the door locks of the second- and third-floor apartments and found that they were a match. Detective Coronado subsequently secured a search warrant for 20 Metcalf, 113 Sisson, and 716 Central, as well as for the vehicles used by Mr. Moronta, Mr. Reyes, and Ms. Solano.

The state charged Mr. Moronta on August 21, 2023, with failing to report a death with the intention of concealing a crime, to wit, possession with intent to deliver a controlled substance, and conspiracy to violate the Uniform Controlled Substances Act, in violation of G.L. 1956 § 23-4-7 (Count 1); felony drug conspiracy, in violation of G.L. 1956 § 21-28-4.08 (Count 2); possession of one ounce to one kilogram of a mixture containing a detectable amount of fentanyl, in violation of § 21-28-4.01.1(a)(7) (Count 3); possession with intent to deliver fentanyl, in violation of § 21-28-4.01(a)(4)(i) (Count 4); possession with intent to deliver xylazine, in violation of § 21-28-4.01(a)(4)(iii) (Count 5); possession of more than ten grams but less than one ounce of xylazine, in violation of § 21-28-4.01(c)(2)(ii) (Count 6); possession of ten grams or less of cocaine, in

violation of § 21-28-4.01(c)(2)(i) (Count 7); and keeping and maintaining a narcotics nuisance, in violation of § 21-28-4.06(b)(1) (Count 10).

On September 26, 2023, Mr. Moronta moved to suppress all evidence obtained as a result of his warrantless arrest and the warrantless search of 20 Metcalf, alleging that both his arrest and the search and seizure were unlawful and violated the Fourth Amendment to the United States Constitution and article 1, section 6 of the Rhode Island Constitution. On October 2, 2023, the Superior Court held a hearing on Mr. Moronta's motion to suppress the fruits of the warrantless search of his person following his arrest and the evidence found in 20 Metcalf after the warrantless search of the second and third floors.

At the suppression hearing, the state called Det. Coronado and Det. Andreozzi. During the state's questioning of Det. Coronado, he testified that officers "made entry into the third floor in an attempt to locate any other bodies or anything else." On cross-examination, however, Det. Coronado admitted there was no indication that anyone was in the third-floor apartment:

> "[DEFENSE COUNSEL]: You had no information about the third floor or anybody being in the third floor; am I correct?
>
> "[DET. CORONADO]: No. Sorry, I had no information, yes.
>
> "[DEFENSE COUNSEL]: You had no information from your informant that there is a dead body in the third floor, correct?

"[DET. CORONADO]: Correct.

"[DEFENSE COUNSEL]: You had no information that there was anybody in the third floor; am I correct?

"[DET. CORONADO]: Correct. Correct."

On redirect, the prosecutor asked Det. Coronado about whether he saw extension cords leading from the second floor to the third floor of 20 Metcalf; he responded in the affirmative and explained that he knew that there were no active utility accounts tied to the third-floor apartment. When pressed on recross, though, Det. Coronado confirmed that he did not mention the extension cords in the affidavit he submitted as part of the search warrant application or mention them to the judge who signed the warrant, nor did he make any notes about the extension cords or take any pictures of them.

After the detectives testified, the state defended the officers' warrantless entry of the second- and third-floor apartments of 20 Metcalf by asserting that the ongoing emergency—namely, the report of a dead body—justified the warrantless entry. Alternatively, it argued, the possibility of destruction of evidence also supported entry into the third-floor apartment. The defense responded that the information received from the confidential informant contradicted the idea that any exigency extended to justify entry of the third-floor apartment. Defense counsel also emphasized that the detectives' actions undermined the notion of an exigency and that, in particular, the suppression hearing was the "very first time [that] anyone is

- 7 -

ever hearing about these extension cords [and that] in an information package that is over 300 pages long, with over 300 pictures, there is ten search warrants, multiple police reports, there is absolutely not one shred of evidence or any mention of these extension cords * * *." The trial justice then reserved his decision and adjourned the proceeding.

The next day, the trial justice announced his decision regarding the motion to suppress. He concluded that both the seizure of the keys found on Mr. Moronta's person in the course of the warrantless arrest and the warrantless search of both the second- and third-floor apartments at 20 Metcalf were justified because "these police officers were responding to a sudden emergency involving a possible death of a person related to an individual who had been under investigation and surveillance for approximately four months." The trial justice found that "the police officer acted rationally and properly in the interest of protecting citizens from harm and destruction of property." He then denied defendant's motion to suppress the keys and evidence seized from the third floor of 20 Metcalf.

The trial justice then began the trial. During the trial, the state called four witnesses: Det. Coronado; Alexander Chirkov, M.D., the acting chief medical examiner for the Rhode Island Department of Health; Ms. Solano; and Det. Andreozzi. Detective Coronado testified again at trial, beginning with his involvement in the drug trafficking task force, and detailing in depth the events of

April 4. Doctor Chirkov explained that he assisted another member of the Medical Examiner's Office in performing the autopsy of Ms. Moronta Palata and summarized the results of this examination. Doctor Chirkov testified that the autopsy of Ms. Moronta Palata revealed that she likely died of a drug overdose in the evening of April 2 or sometime afterwards. Ms. Solano recounted wanting to invite Ms. Moronta Palata to a birthday party and being unable to reach her, as well as her visit to 20 Metcalf with Mr. Moronta the following day. On cross-examination, Ms. Solano acknowledged that she had never visited the third floor of 20 Metcalf, never observed defendant go up to the third floor, and never saw defendant sell drugs to anyone. Detective Andreozzi testified to his involvement in the surveillance operation, his pat down of Mr. Moronta, and what he observed when he arrived at 20 Metcalf.

On November 11, 2023, the trial justice announced his decision. He found the defendant guilty on all charges. The trial justice sentenced Mr. Moronta on February 19, 2024, to twenty-five years at the Adult Correctional Institutions with twenty years to serve and the balance of five years suspended with twenty years of probation. Mr. Moronta then appealed to this Court.

**Standard of Review**

In reviewing a trial justice's denial of a motion to suppress on Fourth Amendment grounds, this Court "review[s] the record to determine, based on the

- 9 -

totality of the circumstances, whether the evidence sought to be suppressed was obtained in violation of the constitutional prohibition against warrantless searches and seizures." *State v. Sinapi*, 295 A.3d 787, 799 (R.I. 2023) (quoting *State v. Terzian*, 162 A.3d 1230, 1238 (R.I. 2017)). As part of this review, "this Court gives deference to a trial justice's factual findings, and those historical 'findings shall not be disturbed unless they are clearly erroneous.'" *State v. Quinlan*, 921 A.2d 96, 105 (R.I. 2007) (quoting *State v. Verrecchia*, 766 A.2d 377, 382 (R.I. 2001)). "However, when this Court reviews 'an alleged violation of a defendant's constitutional rights, this Court must make an independent examination of the record to determine if the defendant's rights have been violated.'" *State v. Gonzalez*, 136 A.3d 1131, 1145 (R.I. 2016) (brackets omitted) (quoting *State v. Harrison*, 66 A.3d 432, 441 (R.I. 2013)).

**Discussion**

On appeal, Mr. Moronta argues that officers entered the third-floor apartment without a warrant or exigent circumstances in violation of the Fourth Amendment and article 1, section 6, and that therefore the fruits of this search must be suppressed.[1] We agree with Mr. Moronta that Det. Coronado and his team had no constitutionally permissible reason to enter the third-floor apartment after finding

---

[1] Mr. Moronta does not challenge the entry into the second-floor apartment on appeal. We assume without deciding that defendant has standing to challenge the entry into the third-floor apartment, as this has not been disputed by the parties.

- 10 -

Ms. Moronta Palata's body in the second-floor apartment and that the trial justice therefore erred in denying defendant's motion to suppress.

The Fourth Amendment and article 1, section 6 protect the right of the people against unreasonable searches and seizures. "It is a 'basic principle of Fourth Amendment law' that searches and seizures inside a home without a warrant are presumptively unreasonable." *Payton v. New York*, 445 U.S. 573, 586 (1980) (quoting *Coolidge v. New Hampshire*, 403 U.S. 443, 477-78 (1971)); *see also State v. Werner*, 615 A.2d 1010, 1011 (R.I. 1992) (recognizing the same under article 1, section 6). The United States Supreme Court has also held "that this presumption may be overcome in some circumstances because 'the ultimate touchstone of the Fourth Amendment is reasonableness.'" *Kentucky v. King*, 563 U.S. 452, 459 (2011) (quoting *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006)). However, establishing an exception to the warrant requirement requires clearing a high bar: "In demonstrating a compelling and urgent necessity sufficient to circumvent the constitutional mandate of a warrant, the police 'bear a heavy burden.'" *Terzian*, 162 A.3d at 1241 (brackets omitted) (quoting *Gonzalez*, 136 A.3d at 1151).

One such exception to the warrant requirement exists when "'the exigencies of the situation' make the needs of law enforcement so compelling that the warrantless search is objectively reasonable under the Fourth Amendment." *Mincey*

*v. Arizona*, 437 U.S. 385, 394 (1978) (quoting *McDonald v. United States*, 335 U.S. 451, 456 (1948)). This Court has applied this exigent-circumstances exception when

> "evidence is likely to be lost, destroyed, or removed during the time required to obtain a warrant and when, because of the circumstances, it is difficult to secure a warrant, a warrantless entry and search may be justified. This exception also encompasses the situation in which police believe a person within requires immediate assistance or other victims or intruders may still be present. 'The need to protect or preserve life or avoid serious injury is justification for what would be otherwise illegal absent an exigency or emergency.'" *State v. Jennings*, 461 A.2d 361, 366 (R.I. 1983) (quoting *Mincey*, 437 U.S. at 392).

In order to justify circumventing the warrant requirement in the case of exigent circumstances, "[t]he police must have an objective, reasonable belief that a crisis can only be avoided by swift and immediate action." *State v. Gonsalves*, 553 A.2d 1073, 1075 (R.I. 1989) (brackets omitted) (quoting *Duquette v. Godbout*, 471 A.2d 1359, 1363 (R.I. 1984)). However, "facts that were not known to the officer at the time of the warrantless entry can never support a finding of exigent circumstances." *Terzian*, 162 A.3d at 1241.

Mr. Moronta stresses that at the time of their entry into the third-floor apartment, officers had already found Ms. Moronta Palata's body in the second-floor apartment as the tip had suggested they would, and they perceived nothing that would have indicated that anyone was in the third-floor apartment. Moreover, he notes, police had already detained both Mr. Moronta and Mr. Reyes, further

- 12 -

undermining the notion that there was a risk of someone destroying evidence in that apartment. Mr. Moronta also disputes the state's characterization of the warrantless entry of the third-floor apartment as a "protective sweep" since there were no facts to suggest that officers were in danger, citing *Maryland v. Buie*, 494 U.S. 325 (1990), and *Chimel v. California*, 395 U.S. 752 (1969).

The state argues before us that the warrantless entry into the third-floor apartment was justified because, as the trial justice found, the situation constituted an "all hands on deck" emergency, which was reinforced by the discovery of keys on Mr. Moronta's person during the traffic stop and the presence of the extension cords leading to the third floor; the state also avers that what was found in the third-floor apartment would have been inevitably discovered. However, the first justification directly contradicts the information that officers possessed at the time of the entry into the third-floor apartment, and the latter, as Mr. Moronta notes, was not raised at any point during the proceedings below and is therefore waived.

The United States Supreme Court recently clarified its conception of the emergency-aid exception in *Case v. Montana*, 607 U.S. 107 (2026), in which police made a warrantless entry into the house of an individual credibly believed to be in the midst of a mental health crisis who had possibly harmed himself (or who was at

- 13 -

risk of doing so).[2] *Case*, 607 U.S. at 110-11. The Supreme Court held that "an emergency-aid entry provides no basis to search the premises beyond what is reasonably needed to deal with the emergency while maintaining the officers' safety." *Id.* at 117. The state quotes this exact language to support the notion that "while defendant and Reyes had already been detained, the police had no idea if someone else was already in the home, possibly lying in wait or possibly clinging to life." However, as Mr. Moronta correctly notes, "the exigency that justified a warrantless entry * * * evaporated once officers found [Ms. Moronta Palata's] body," and there was no evidence to suggest that there was anyone on the third floor in danger or anyone who could have endangered officers. The state's reliance on *Case* is therefore misplaced.

The trial justice erred in finding that an ongoing emergency justified entry into the third-floor apartment—either for the sake of a full search or a protective sweep. Although the state suggests that there could have been other people in the third-floor apartment in need of assistance, there were no objective facts known to police at the time of their entry to support this contention. In fact, Det. Coronado testified that he "had no information that there were occupants in the third floor at the time." When

---

[2] Specifically, Mr. Case's ex-girlfriend contacted police after he called her threatening suicide. *Case v. Montana*, 607 U.S. 107, 110 (2026). During the call, Mr. Case explained in detail a plan for how he would harm himself, and she heard a sound like the cocking of a gun and a subsequent "pop," followed by silence on the line. *Id.* It was at this point that she called 911. *Id.*

- 14 -

asked whether he heard anything "[o]n the third floor * * * that made [him] believe there was anybody in the third floor [apartment]," he answered in the negative. The state acknowledges that "there was no trail of blood, smells, or sounds inside the house" but contends that "there was a dead body that had not been reported despite many comings and goings that afternoon" and that "[t]here were also connections between the second[-] and third-floor apartment and with fentanyl."

The state's argument overlooks the fact that the information Det. Coronado received from the confidential informant, that Ms. Moronta Palata was possibly deceased, was verified the moment officers found her body in the second-floor apartment. This was the emergency justifying the warrantless entry for which officers were administering aid. The informant provided nothing to suggest that there was an emergency beyond Ms. Moronta Palata's possible death, and Det. Coronado failed to articulate anything he observed once inside 20 Metcalf alerting him that an emergency was still ongoing.

The state offers two additional factors that it claims supports the warrantless entry into the third-floor apartment beyond what the trial justice cited in his decision denying the motion to suppress: (1) the traffic stop of Mr. Moronta in which officers found keys to both the second- and third-floor apartments on his person[3] and (2)

---

[3] The state contends that during the traffic stop, "defendant was found to possess keys to the second and third floor apartments," but Det. Andreozzi did not testify

- 15 -

officers' on-scene observation of extension cords running from the second floor and under the door to the third-floor apartment. It emphasizes that, by contrast, officers did not attempt to enter or sweep the first-floor apartment, since its occupants had no connection to Mr. Moronta, as evidence that officers did not exceed the scope of what the exigency required. But, as Mr. Moronta notes, Det. Andreozzi did not testify that he communicated about the existence of the keys to any of the officers on the scene at 20 Metcalf before they entered the apartments, so this cannot support Det. Coronado's warrantless entry. *Terzian*, 162 A.3d at 1241. Further, the presence of the extension cords cannot sustain the weight of the state's argument here. Police simply did not have an objectively reasonable basis to think that the extension cord could, without more, suggest that anyone was in need of immediate aid in the third-floor apartment, or that anyone posed a threat to officers' safety. *See Michigan v. Fisher*, 558 U.S. 45, 47 (2009).

Indeed, no cases support the state's argument as to these factors as justification. In *Brigham City v. Stuart*, 547 U.S. 398 (2006), police made a warrantless entry into a home after responding to a noise complaint because they observed a fistfight occurring inside the house through the windows and that one of the participants had been injured. *Brigham City*, 547 U.S. at 400-01. In *Case*, upon

---

either during the suppression hearing or during the trial itself that he knew that those keys were to those apartments when he discovered them on defendant's person.

arriving at the defendant's house, officers could see through the window an empty handgun holster and a notepad with writing on it, which they interpreted to be a suicide note, corroborating the report that preceded their arrival. *Case*, 607 U.S. at 110-11. In each case, police *observed* articulable indicia of harm to individuals. Here, by contrast, Det. Coronado admitted that his officers did not perceive anything to suggest that anyone was in danger on the third floor. Therefore, it was objectively unreasonable for police to rely on the emergency-aid exception to justify their warrantless entry to the third-floor apartment, and the trial justice erred in relying on the emergency-aid exception to deny Mr. Moronta's motion to suppress.

Moreover, the state does not offer any compelling reason why the warrantless entry into the third-floor apartment was necessary to prevent the destruction of evidence. Just like the emergency-aid exception, there must be an objectively reasonable basis to support a fear that evidence could be at imminent risk of destruction. *See, e.g.*, *King*, 563 U.S. at 456, 462 (warrantless entry into apartment could be justified based on noises heard by police that sounded like the destruction of evidence). But here, there was no indication that anyone was in the third-floor apartment, and with the knowledge that Mr. Moronta and Mr. Reyes were already in custody and with police surrounding 20 Metcalf, there was objectively no risk of the destruction of evidence in the third-floor apartment. Moreover, Det. Coronado observed via the pole camera Ms. Solano leaving 20 Metcalf and did not identify

anyone else that he feared could have been in the apartment. Therefore, the state's assertion that the warrantless entry was necessary to prevent the destruction of evidence was unfounded, and the trial justice erred in relying on this justification in denying Mr. Moronta's motion to suppress.

Finally, the state argues that "the drug paraphernalia on the third floor would have been inevitably discovered even without being observed in plain view during the cursory search attendant to the exigent circumstances." However, the state did not raise this argument below, either at the motion to suppress stage or at trial. Therefore, it is waived. *See State v. Tavares*, 312 A.3d 449, 458 (R.I. 2024) ("As we have said on innumerable occasions, a litigant cannot raise an objection or advance a new theory on appeal if it was not raised before the trial court." (quoting *State v. Barros*, 148 A.3d 168, 172 (R.I. 2016))).

The next question, then, is whether the trial justice's failure to suppress the evidence seized from the third-floor apartment was harmless. *See Gonzalez*, 136 A.3d at 1156 (noting that the harmless error principle applies to the admission of evidence obtained in violation of a defendant's Fourth Amendment rights). We conclude that it was not. A harmless error is one that "in the setting of a particular case is so unimportant and insignificant that it may, consistent with the Federal Constitution, be deemed harmless, not requiring the automatic reversal of the conviction." *State v. Lopez*, 943 A.2d 1035, 1043 (R.I. 2008) (brackets omitted)

- 18 -

(quoting *Chapman v. California*, 386 U.S. 18, 22 (1967)). "[W]hether or not an error is harmless turns on whether it is reasonably possible that the error contributed to the conviction." *Id.* "When evaluating improperly admitted evidence, this Court reviews the remainder of the evidence introduced to discern whether the error was harmless beyond a reasonable doubt." *State v. Ramirez*, 936 A.2d 1254, 1267 (R.I. 2007).

Given the large volume of drugs and contraband seized from the third-floor apartment, it is reasonable for us to infer that all of the counts with which Mr. Moronta was charged (each containing an element related to drug possession) would have been affected had the state been unable to rely on what was found within the third-floor apartment. It would have also affected what evidence Det. Coronado had to include in his warrant application, and therefore the subsequent searches of 113 Sisson and 716 Central. Therefore, we conclude without hesitation that this error was not harmless.

**Conclusion**

For the foregoing reasons, we hold that the trial justice erred in denying the motion to suppress the evidence seized from the third-floor apartment. The defendant's conviction is vacated, and we remand this case to the Superior Court for a new trial.

- 19 -

# STATE OF RHODE ISLAND

## SUPREME COURT – CLERK'S OFFICE

Licht Judicial Complex
250 Benefit Street
Providence, RI  02903



## OPINION COVER SHEET

| | |
|---|---|
| **Title of Case** | State v. Noel Ignacio Moronta. |
| **Case Number** | No. 2025-83-C.A. (P2/23-2689AG) |
| **Date Opinion Filed** | July 15, 2026 |
| **Justices** | Suttell, C.J., Robinson, Lynch Prata, Long, and Indeglia (ret.), JJ. |
| **Written By** | Associate Justice Melissa A. Long |
| **Source of Appeal** | Providence County Superior Court |
| **Judicial Officer from Lower Court** | Associate Justice Daniel A. Procaccini |
| **Attorney(s) on Appeal** | For State:<br><br>Brendan P. Sullivan<br>Department of Attorney General |
| | For Defendant:<br><br>Piper Pehrson<br>Rhode Island Public Defender |